UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOYCE MCCLANE,

        Plaintiff,                            Civil Action No. 18-CV-13774

vs.                                      HON. BERNARD A. FRIEDMAN

GENESEE COUNTY
ROAD COMMISSION,

        Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on defendant's motion for summary judgment [docket entry 18]. Plaintiff has responded and defendant has replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

***Introduction***

This is an employment discrimination case. Plaintiff Joyce McClane worked for defendant Genesee County Road Commission ("GCRC") for many years before she was discharged in July 2018 for failing to return to work after a one-year leave of absence for short-term disability caused, she claims, by defendant's discriminatory treatment of her. She began working for GCRC in 1981 as an entry-level clerk and ended as a "senior purchasing coordinator." Pl.'s Dep. at 70; Am. Compl. ¶ 15. During her tenure, plaintiff held various other titles as well, including "senior accountant" and "purchasing manager." Def.'s Ex. 4.

Plaintiff alleges that for the entire time she worked for the road commission she was not paid fairly or treated respectfully, and she attributes this to discrimination based on her race (African-American) and gender. Plaintiff has a long history of filing internal complaints with the

county board of commissioners about her various grievances. For example, in a letter to the board in November 1992 in which plaintiff complained about not being promoted, she claimed she was the victim of "unprovoked turmoil and harassment." Def.'s Ex. 5. In 1993 plaintiff went on a medical leave of absence, claiming emotional distress from the harassment and discrimination to which she had been subjected at work. Defendant discharged her when she refused to return to work despite an independent medical examination showing that she was fit for duty. Def.'s Ex. 7. In May 1994, plaintiff sued the road commission in state court for race discrimination. Def.'s Ex. 6. That case was settled in 1996 for $10,000; plaintiff was rehired and promoted from senior accountant to purchasing coordinator. Def.'s Ex. 4 and 8.

In May 2003, plaintiff complained to GCRC's manager/director, John Daly, that she was not being paid enough. Def.'s Ex. 10. Daly had the personnel director determine what other road commissions were paying similarly situated employees. *Id.* In July 2003, apparently as a result of this inquiry, Daly agreed to promote plaintiff "from level 1 in her current job classification to level 3, fourth year"; plaintiff agreed to withdraw "all complaints of this nature." Def.'s Ex. 16. In 2013, after plaintiff obtained a professional certification, defendant gave her a $6,800 raise and upgraded her title to purchasing manager. Pl.'s Dep. at 48, 70. Plaintiff states she had to file a complaint with the board before defendant agreed to take this action. *Id.* at 48-49.

Complaints that are more relevant to the instant case date back to 2015. In April 2015, plaintiff filed an internal GCRC complaint, alleging she was being harassed and bullied by the maintenance director, John Bennett. Pl.'s Ex. 2. She complained that Bennett was creating a hostile work environment and demanded, "this needs to stop." *Id.* In mid-2016, Bennett was put on a ten-week paid leave of absence, apparently while various co-worker complaints against him

were investigated.  When plaintiff heard that Bennett may be returning to work, plaintiff complained to HR that he had been "effectively enjoying a lengthy paid vacation . . . but his ill-treatment of me was condoned and I was allowed to work in a hostile environment."  Pl.'s Ex. 3.

In December 2015, plaintiff presented Daly with a multi-page "complaint against Melissa Williams, Finance Director."  Def.'s Ex. 22.  At that time, plaintiff was under Williams' supervision.  Daly testified that plaintiff complained about all of her supervisors, and he put her under various supervisors – from finance director to HR director to himself, and others – over the years in an effort to deal with her complaints.  Plaintiff complained that Williams sent a memo to the three managers in the office –  IT, Finance, and Purchasing (plaintiff being the purchasing manager) – setting forth new comp time rules and suggesting that comp time was being overused.  Plaintiff felt that this was a personal attack and that she had been using comp time for years with no complaints from higher-ups.

In February 2016, Daly denied plaintiff's request "to be reclassified and promoted to Purchasing Director."  Pl.'s Ex. 5.  Part of plaintiff's discrimination theory is that Daly should have promoted her to this position.  But GCRC has never had a director of purchasing, and Daly testified that he is not aware of any road commission that has such a director.  Daly Dep. at 30-32.

In April 2016, plaintiff submitted another complaint about Williams to the road commission, this time complaining about Williams interfering with her, "not staying in her lane," "lying" about how much comp time plaintiff had been taking, and using a tone of voice plaintiff "felt was retaliation."  Def.'s Ex. 23.  The county HR director, Anita Galajda, investigated plaintiff's complaints and reported her findings in October 2016.  Def.'s Ex. 26.  Plaintiff told Galajda that various supervisors were working together to "keep her out of the purchasing module so they can

abuse the system." *Id.* at 2. Plaintiff also complained that Williams had interfered with her job performance by denying her training. Galajda concluded that there had been tensions between plaintiff and Williams going back to 2012, but she found no merit to these complaints.

In October 2016, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against GCRC in which she made the following allegations of race discrimination and retaliation:

> From the time of the Director of Purchasing and Special Products retirement in 2006, I have performed the job duties of Director. I have repeatedly asked the Caucasian Manager/Director of the Road Commission for a corresponding Director title and wage increase, most recently in 02-2016, to no avail. I have complained internally of race discrimination by another Caucasian Director as recently as 07-2016.
>
> I believe that I have been subjected to different terms and conditions of employment in regards to job classification and denied wages due to my race, African-American, and in retaliation for complaining of race discrimination in violation of Title VII of the Civil Rights Act of 1990.

Pl.'s Ex. 11. Plaintiff indicates that the EEOC issued "notices of right to sue . . . dated September 12, 2018 and October 22, 2018." Am. Compl. ¶ 12. This suggests that she filed two EEOC charges, but there is only one such charge in the record.

In November 2016, in response to plaintiff's April 2016 demand that she be moved from under Williams' supervision, Daly put plaintiff under the supervision of the HR director, Donna Poplar. Daly Dep. at 39; Def.'s Ex. 27. In a March 14, 2017, letter to Daly and the board of commissioners, plaintiff complained about "the harassment, threats and discrimination that I am experiencing" and demanded that it "cease IMMEDIATELY." Def.'s Ex. 27. She also demanded to be removed from under Poplar's supervision. *Id.* According to plaintiff, "Mrs. Poplar is being

used[1] to continue the ongoing discrimination, retaliation and the creation of a very hostile work environment for me." *Id.* Plaintiff complained that Poplar threatened to "strip me of my secretary"; and that Poplar and Daly "authorized . . . renovations to take place in the Finance Department so that my office would be moved. . . . Please note that I have been in my current office for over 13 years." *Id.* Plaintiff's complaints regarding Poplar's reconfiguration of the HR and finance departments, which involved moving the office used by plaintiff and another employee, are discussed further below.

On March 21, 2017, plaintiff sent an email to, among others, Daly and Cloyce Dickerson, a GCRC commissioner with whom plaintiff was on friendly terms, complaining that:

> I am growing increasingly concern[ed] about the behavior and communication style of Mrs. Poplar.
>
> For example, the way she spoke to staff on Monday, March 20, 2017 during a staff meeting was highly offensive, bullying and is creating a hostile work environment.
>
> I am sending this correspondence to advise the Genesee County Road Commission and to allow the Road Commission to make a determination as to how and when this behavior on the part of Mrs. Poplar will be addressed.

Def.'s Ex. 28.

Two days later, on March 23, 2017, plaintiff sent another email to Daly, Dickerson,

---

[1] At her deposition, plaintiff explained her allegation that Poplar was "being used" to harass and discriminate against her. According to plaintiff, as soon as Poplar was hired "she started retaliating against me, discriminating against me at the behest of John Daly." Pl.'s Dep. at 77. "[A]t the behest of John Daly, she did many things that . . . she wouldn't normally done" [sic]. *Id.* at 79. "[B]ased on what I was seeing at the time, she was getting her marching orders from John Daly." *Id.* at 80. When asked what this had to do with her race, plaintiff testified: "It's a saying in the black community that many times slave owners use black people to get what they wanted from other black people." *Id.* at 81. Daly is Caucasian; Poplar is African-American.

and others, complaining that:

> This correspondence is once again to notify the [GCRC] regarding
> Mrs. Poplar's continuing retaliation and interference against me and
> creating a hostile work environment.
>
> A mandatory meeting was called . . . today with Randy Dellaposta,
> Equipment Director, Coetta Adams, Finance Director, Stephanie
> Jaeger and myself.  In spite of the numerous discussions with Randy
> Dellaposta & Coetta Adams regarding a functioning purchasing
> process, they have continued to interfere with my ability to do my
> job.
>
> It had been determined 7 months ago, by ALL of the directors, that
> ALL purchase orders would come through purchasing.
>
> These 2 white employees continue to interfere with my job, now with
> the assistance of Mrs. Poplar, whom I have filed 2 complaints against
> with the [GCRC].  They are colluding once again to adversely affect
> my duties to effectively perform my job as Purchasing Manager.
>
> This is the 3rd official notification of Mrs. Poplar's discriminatory
> and retaliatory behavior towards me . . . and NOTHING has been
> done.

Def.'s Ex. 29.

On March 27, 2017, Daly placed plaintiff on paid administrative leave pending an

investigation into her allegations.  His memo to plaintiff states:

> I am reaffirming the receipt of your three complaints dated March 14,
> 2017; March 21, 2017; and March 24, 2017.  To ensure that these
> three complaints are investigated in a professional and timely
> manner, I have engaged outside legal counsel, who will be contacting
> you in the near future to initiate the investigation.
>
> Further, in order to preserve the integrity of the investigatory process,
> I am placing you on a paid administrative leave effective this date
> until further notice.

Def.'s Ex. 30.[2]

The GCRC retained attorney Kendall Williams to investigate plaintiff's March 2017 complaints. Attorney Williams interviewed plaintiff and eleven others, including everyone plaintiff had mentioned in her complaints. In his June 2017 report, Williams concluded that no violations of plaintiff's rights under the Elliott-Larsen Civil Rights Act ("ELCRA") or Title VII had occurred, and that plaintiff "believes she is treated discriminatorily whenever a supervisor or Division Head

---

[2] At his deposition, Daly testified that he placed plaintiff on paid leave

> because at that point she had filed complaints [with] the EEOC . . . against all the department heads at the road commission except for one. She had filed previously, within the six-month period prior to that she had filed a complaint against me with the EEOC.

> I needed to – There needed to be separate – If there was going to be impartiality with any investigation one of the parties needed to be removed, so I removed – So the simplest thing to do was to remove one rather than to remove all five or six.

> *   *   *

> I thought that it would not be appropriate to have continued interaction between them. . . . And it seemed like to have a clear, sterile, pure environment where there was no conflict going on and the minimal level of emotion this seemed to be the appropriate decision for the manager/director to make in order to protect the integrity of the investigation.

> *   *   *

> I put Joyce McClane on administrative leave simply because the environment at the road commission in terms of communication in that building was becoming toxic and it was becoming very emotional almost every day. In order to preserve people's recollections of the events as they occurred I needed to separate that.

Daly Dep. at 58, 62, 65-66.

questions her performance or her interpretation of GCRC purchasing policies." Def.'s Ex. 32 at 5.

Williams noted that plaintiff "believes a new position of Purchasing Director should be created by

GCRC, and that she should be placed in such position with a corresponding increase in her salary."

*Id.* at 6. Williams found no merit to this complaint:

> Ms. McClane cites, as evidence of her discriminatory treatment, that she was not placed in the position of Director Special Projects when Tim Sabin retired in 2005. Ms. McClane admits that Mr. Sabin's job duties were far broader than the purchasing area at GCRC. Nonetheless, she claims that she currently performs all of the duties contained in Mr. Sabin's former job description. All of the witnesses who are aware of the job duties and functions performed by Mr. Sabin confirm that such duties were much broader and greater in scope than those performed by Ms. McClane. Furthermore, after Mr. Sabin's retirement, his duties were spread among other Division Heads or Directors. . . . Research of the organizational structures of other county road commissions in Michigan indicates that they do not have separate purchasing departments.
>
> \* \* \*
>
> When Ms. McClane filed a reallocation request in 2013, GCRC did elevate her from Purchasing Coordinator to Purchasing Manager in response to such request. This may have caused Ms. McClane to have the impression that she could seek promotion to the position of Purchasing Director, although such position has never existed at GCRC.

*Id.* at 6-7.

In a memo dated June 26, 2017, Daly informed plaintiff that attorney Williams'

investigation was finished and that he had found no violations of any federal or state employment

statutes. Def.'s Ex. 33. In a letter dated June 27, Poplar directed plaintiff "to return to work on

Monday, July 10, 2017," and "meet with me . . . to discuss all relevant purchasing changes, any

changes germane to your job responsibilities and to retrieve your work related property." Def.'s Ex.

34. On July 10, Poplar also changed plaintiff's job title to senior purchasing coordinator. Def.'s Ex.

35.  There was no change in plaintiff's pay.  Pl.'s Dep. at 134.  At the same time, Poplar changed "all of HR staff who held titles as managers to senior coordinators . . . [b]ecause of the level of responsibility that they had I didn't think that it warranted a title of being managers."  Poplar Dep. at 78.

        As directed, plaintiff returned to work on July 10.  On July 11 she provided Poplar with a memo indicating how plaintiff and Stephanie Jaeger (the other purchasing department employee who had been plaintiff's secretary) intended to divide responsibilities.  Def.'s Ex. 37.  However, ten days later plaintiff took a medical leave of absence, claiming that she was disabled by the discriminatory and retaliatory treatment to which she had been subjected at work.[3]  Pl.'s Dep. at 9, 131-33.[4]  Such leaves of absence (during which time employees are paid 70% of their salary,

---

[3] Plaintiff makes much of the fact that while she was out on her paid administrative leave, Poplar reconfigured the HR office which resulted in plaintiff's office being moved down the hall.  Stephanie Jaeger, who had been plaintiff's secretary, was given some increased responsibilities so that now plaintiff and Jaeger would work together, rather than Jaeger being under plaintiff.  Plaintiff believes it is discriminatory for her office to have been moved and her secretary to have been taken away, although she acknowledged that her pay was not reduced.  Pl.'s Dep. at 79-84, 134.  Plaintiff's title was changed from purchasing manager to senior purchasing coordinator, but other employees' titles were also changed as part of the office reorganization.  Id. at 134; Poplar Dep. at 78.  Jaeger's title was changed from purchasing secretary to "purchasing administrator"; plaintiff and Jaeger still performed the same tasks, but before the change plaintiff felt that Jaeger was doing more secretarial work.  Pl.'s Dep. at 135-36, Poplar Dep. at 79.  Poplar testified that she decided to reconfigure the HR, finance, and purchasing departments in a way that seemed more logical – for example creating an area where people coming into HR would not be able to look onto the desks of the workers in these other departments.  Poplar Dep. at 36-38.  She also testified that Jaeger was given more responsibility and that Jaeger and plaintiff would be responsible for their own clerical duties.  Id. at 44.

[4] Regarding the reason for taking a disability leave of absence, plaintiff testified:

> When I came back [from administrative leave] – the reason why I went back, anxiety, the hostile work environment, just with a week's time, [Poplar] demoted my title, which gave me less authority with what I needed to do.  And just the overwhelming discrimination, what

Poplar Dep. at 51), are deemed to be "short-term disability" leaves under GCRC's policy. GCRC has no long-term disability policy. Employees who take a short-term disability leave of absence must return to work within one year or be discharged. Plaintiff did not return to work at the end of her year's absence. In a letter dated July 20, 2018, Poplar informed plaintiff that "you have exceeded your one (1) year maximum allowable Short Term Disability benefit. Your failure to report back to work on 07/19/18 has resulted in your termination of employment . . . ." Def.'s Ex. 38.

At her deposition, plaintiff elaborated on some of her allegations. One example she cited of race and gender discrimination is the fact that one of her supervisors, Melissa Williams (the finance director who resigned in September 2016), would not give plaintiff access to "the purchasing system" that plaintiff alleges she needed in order to do her job. Williams and Coetta Adams (the IT manager) allegedly did give access to two white males, Randy Dellaposta and John Bennett. Pl.'s Dep. at 42-44, 50, 52, 62-63. Plaintiff believes Daly discriminated against her as well, based on her race and gender, because "he did not promote me when there were white males in similar roles as I was in," but she did not elaborate. *Id.* at 45. Apparently this is a reference to Tim Saban, but he had greater responsibilities than plaintiff did, as plaintiff conceded at her deposition. *Id.* at 75-76. Although Sagan left the GCRC in 2006 or 2007, *id.* at 68, plaintiff believes she deserved his job when he retired. *Id.* at 73.

_____

I was feeling at the time, racial discrimination, being bullied. I went to my doctor and they told me, You're going to have to come off. If I didn't, I was – it would not be good for my health.

Pl.'s Dep. at 131.

*Plaintiff's Complaint*

In her amended complaint, plaintiff asserts a claim for race and gender discrimination in violation of the Elliott-Larsen Civil Rights Act and Title VII (Count I), and retaliation in violation of these statutes (Count II). Under Count I she lists the following examples of discrimination:

> a. Demoting Plaintiff on or about July 10, 2017 changing her title from Purchasing Manager to Senior Purchasing Manager [sic: senior purchasing coordinator] and taking away support staff assigned to her;
>
> b. Being denied raises which were due her when similarly situated Caucasian employees were given such raises;
>
> c. Being denied promotions when similarly situated Caucasian employees were promoted;
>
> d. Being denied access to critical information and programs necessary to perform her job duties;
>
> e. Being treated in a disrespectful manner;
>
> f. Being denied attendance at meetings at which purchasing was discussed and decisions made, although those were essential parts of Plaintiff's job responsibilities;
>
> g. Being placed on an administrative leave;
>
> h. Being forced to take a medical leave of absence due to the discriminatory treatment; and
>
> i. Ultimately being terminated by Defendant.

Am. Compl. ¶ 24. Under Count II, plaintiff makes the following allegations regarding retaliation:

> 30. Plaintiff repeatedly engaged in conduct protected under both Title VII and the ELCRA, i.e., opposing and complaining of the racially discriminatory and harassing conduct by Defendant's agents, servants, and/or employees.
>
> 31. Defendant had knowledge of Plaintiff's protected activity, to-wit: Plaintiff repeatedly complained to her supervisors and the

Board of Commissioners, as well to as the Equal Employment Opportunity Commission, about a pattern and practice of race and sex discrimination and not remediating unlawful employment practices.

### Limitations Periods

Since plaintiff claims that defendant has discriminated against her ever since she was hired in 1981, it is important to keep the applicable statutes of limitations in mind. Elliott-Larsen claims are subject to a three-year limitations period. *See Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 472 Mich. 263, 284 (2005). Plaintiff commenced this action on December 5, 2018; therefore, nothing that happened to her before December 5, 2015, is actionable under Elliott-Larsen. Title VII requires a plaintiff to file an EEOC charge within 300 days of the alleged discriminatory act. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001). In the present case, plaintiff's EEOC charge was filed on October 31, 2016. Therefore, nothing that happened to her before January 5, 2016, is actionable under Title VII. These dates are significant because plaintiff states in her response brief that "McClane's current concerns are for matters that arose beginning in 2014," and she points to events going as far back as 2014 and mid-2015. Pl.'s Br. at 3.

Another important limitation on plaintiff's Title VII claims, which the parties do not discuss, is that "[a]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [the plaintiff's] EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). This rule, combined with the limitations period, severely restricts the scope of plaintiff's Title VII claim.

### Defendant's Summary Judgment Motion

Defendant argues that plaintiff has failed to make out a prima facie case of discrimination or retaliation and that, even if she could make out a prima facie case, she cannot show

12

that any of the action taken against her was pretextual.

Plaintiff has no direct evidence of race or gender discrimination, so the *McDonnell-Douglas* burden-shifting framework applies. The analysis is the same under both Title VII and Elliott-Larsen:

> Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a prima facie case of discrimination by a preponderance of the evidence. To establish a prima facie case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.
>
>        *    *    *
>
> Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391-93 (6th Cir. 2008) (citations omitted).

Defendant's main argument is that plaintiff cannot make out a prima facie case because she did not suffer an adverse employment action. The Sixth Circuit has defined this term

as follows:

> An adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment." The action must "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."
>
> . . . [R]eassignments and position transfers "can qualify as adverse employment actions, particularly where they are accompanied by 'salary or work hour changes.'" We also consider whether an action resulted in a plaintiff receiving "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation," along with other markers of prestige and desirability.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607-08 (6th Cir. 2019) (citations and footnote omitted).

Regarding the retaliation claim (again, in the absence of direct evidence), plaintiff must first establish a prima facie case of retaliation by demonstrating four elements:

> (1) [the plaintiff] engaged in activity protected by Title VII; (2) [the plaintiff's] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

"If [Plaintiff] succeeds in making out the elements of a prima facie case of retaliation, the burden of production shifts [to the employer] to articulate a legitimate, non-retaliatory reason for the [adverse action]." "If the [employer] satisfies its burden of production, the burden shifts back to [Plaintiff] to show that the reason was a pretext for retaliation.

The analysis of a retaliation claim brought under the ELCRA "is identical to the Title VII analysis."

\* \* \*

With respect to the third element, to meet the requirement of demonstrating a materially adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Meeting this element is easier than meeting the adverse employment action element of a prima facie case of discrimination. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69, 126 S.Ct. 2405 (identifying as a potential materially adverse action "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement"). . . .[5]

---

[5] Michigan courts, in interpreting the Elliott-Larsen Civil Rights Act, do not define adverse employment action differently in the discrimination and retaliation contexts. In both, adverse employment action

> must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. *Meyer v. Center Line*, 242 Mich.App. 560, 569, 619 N.W.2d 182 (2000). In addition, there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling. *Wilcoxon*, 235 Mich.App. at 364, 597 N.W.2d 250. Materially adverse employment actions are akin to " ' "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." ' " *Id.* at 363, 597 N.W.2d 250, quoting *Kocsis v. Multi–Care Mgt., Inc.*, 97 F.3d 876, 886 (C.A.6, 1996), quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (C.A.7, 1993).

*Chen v. Wayne State Univ.*, 284 Mich. App. 172, 201–02, 771 N.W.2d 820, 839 (2009). Similarly, in another recent retaliation case, the Michigan Court of Appeals stated:

> An adverse employment action is more than a "mere inconvenience or an alteration of job responsibilities ...." *Peña v. Ingham Co. Rd. Comm.*, 255 Mich. App. 299, 311; 660 N.W.2d 351 (2003) (quotation marks and citations omitted). "[T]here must be some objective basis for demonstrating that the change is adverse because a plaintiff's subjective impressions ... are not controlling." *Id.* (quotation marks,

15

Finally, Plaintiff must demonstrate causation between these materially adverse employment actions and her gender discrimination complaint. The Supreme Court has made clear that Title VII retaliation claims require traditional but-for causation, wherein a plaintiff must show "'that the harm would not have occurred' in the absence of–that is, but for–the defendant's conduct." Thus, a defendant will be entitled to summary judgment "[s]o long as [nondiscriminatory] factors were sufficient to justify [its] ultimate decision."

* * *

This Court has held that "temporal proximity [between a Title VII complaint and an adverse employment action] alone can be enough" circumstantial evidence of causation if the two are sufficiently close in time. "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."

*Redlin*, 921 F.3d at 613-15 (most citations omitted).

In her response brief, plaintiff argues that she suffered the following adverse employment actions: being placed on paid leave for fifteen weeks (March to July 2017); the change in her title from purchasing manager to senior purchasing coordinator (July 2017); "removal of her support staff," i.e., the change in the relationship between plaintiff and Jaeger (July 2017); "office relocation" (July 2017); being denied a promotion to director (February 2016); "being denied access to critical information and programs" (apparently from 2014 through at least 2016); and "being denied attendance at critical meetings pertaining to her job function" (unknown date). She has abandoned her claim that her termination was discriminatory or retaliatory: "Plaintiff does not

brackets, and citations omitted).

*Hannah v. Blue Cross Blue Shield of Mich.*, No. 331940, 2017 WL 3642656, at *9 (Mich. Ct. App. Aug. 24, 2017)..

contend that the termination decision itself [was] discriminatory or retaliatory as Plaintiff, due to Defendant's unlawful conduct, was medically unable to return to work." Pl.'s Br. at 23. Plaintiff argues that all of these things support her discrimination claim, and that the paid administrative leave and the changes to her position and office location support her retaliation claim.

***Discussion***

***I. Title VII***

Having considered the parties' arguments and reviewed the entire record, the Court concludes that plaintiff's Title VII claim fails because she has not identified any actionable adverse employment action during the ten-month window (January - October 2016) that might fall within the parameters of plaintiff's EEOC charge. As noted above, plaintiff's EEOC charge alleged:

> From the time of the Director of Purchasing and Special Products retirement in 2006, I have performed the job duties of Director. I have repeatedly asked the Caucasian Manager/Director of the Road Commission for a corresponding Director title and wage increase, most recently in 02-2016, to no avail. I have complained internally of race discrimination by another Caucasian Director as recently as 07-2016.
>
> I believe that I have been subjected to different terms and conditions of employment in regards to job classification and denied wages due to my race, African-American, and in retaliation for complaining of race discrimination in violation of Title VII of the Civil Rights Act of 1990.

These allegations are quite narrow. In the first two sentences, plaintiff alleges that defendant discriminated against her by denying her a promotion to a "director" position; and in the third and fourth sentences plaintiff alleges that defendant retaliated against her by denying her this position because she complained about race discrimination in July 2016 (referring to her complaint to HR that her co-worker, John Bennett, the maintenance director, was bullying and harassing her).

This claim fails because the position plaintiff wanted – "purchasing director" – has never existed. Daly testified that there is no such position – not at GCRC and not at other road commissions. Plaintiff cannot claim that defendant discriminated or retaliated against her for denying her a promotion to a nonexistent position. There is simply no "adverse action" to support this claim. Nor has plaintiff shown that other employees were promoted to this or any other comparable, nonexistent position.

The allegation that plaintiff "complained internally of race discrimination by another Caucasian Director as recently as 07-2016" does not state a prima facie claim either. This is a reference to plaintiff's complaints about the maintenance director, John Bennett. In July 2016, plaintiff learned that Bennett was being allowed to return to work. Bennett had been put on a ten-week paid leave of absence while complaints by co-workers, including plaintiff, were investigated. In a July 14, 2016, letter to HR director Makini Jackson, plaintiff indicated that she was "disturbed and distraught at receiving this notice" because Bennett had "bullied me, harassed me, lied and retaliated against me." Pl.'s Ex. 3. Plaintiff then summarized her past complaints about Bennett (e.g., not paying attention during a purchasing training; interrupting another training with rude questions; screaming at plaintiff about an asphalt delivery; and walking out of a meeting), but all of this happened, according to plaintiff's summary, in March and April 2015, and none of it involved allegations of discrimination or retaliation. Again, there is no "adverse action" here to support a claim.

Plaintiff points to other instances of alleged discrimination/retaliation (e.g., the July 2017 change to her title and relocation of her office; not being included in meetings; and being denied access to a certain computer program and training), but none of this is mentioned in her

EEOC charge, so it cannot be part of her Title VII claim.

What remains of plaintiff's Title VII claim is the allegation that Daly retaliated against her by putting her on paid leave when she made her three complaints in March 2017 about HR director Poplar. As noted above, those complaints made vague allegations of "discrimination" and "hostile work environment." After plaintiff made the third complaint, Daly put plaintiff on administrative leave for fifteen weeks pending attorney Williams' investigation into plaintiff's complaints. Even assuming plaintiff's complaints were protected activity, defendant is entitled to summary judgment because being placed on paid leave is not adverse action. Plaintiff herself, when she learned that her "bullying/harassing" co-worker John Bennett was returning from a ten-week paid leave, complained to HR that he had "effectively [been] enjoying a lengthy paid vacation." Pl.'s Ex. 3. More importantly, the cases hold that a paid leave of absence is not an adverse employment action. *See, e.g., Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3rd Cir. 2015) (stating, where plaintiff's paid suspension lasted three months, "[w]e therefore agree with our sister courts that a suspension with pay, 'without more,' is not an adverse employment action under the substantive provision of Title VII"); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (holding that plaintiff suffered no adverse employment action when she was put on paid administrative leave from April to September 1997 and then restored to her position); *Spellman v. Ohio Dep't of Transp.*, 244 F. Supp. 3d 686, 702 (S.D. Ohio 2017) (stating that "Sixth Circuit case law suggests that temporary removal or forced administrative leave with pay are not, in and of themselves, materially adverse employment actions.").[6]

---

[6] *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584 (6th Cir. 2007), cited by plaintiff, is not to the contrary. In that case, the court found that defendant took adverse action against plaintiff by placing her on a one-week paid leave of absence, requiring her to surrender

This claim fails for the additional reason that plaintiff did not allege in her EEOC charge that Daly retaliated against her by placing her on a paid leave of absence. Rather, in her EEOC charge plaintiff alleged that she was "denied wages due to my race, African-American, and in retaliation for complaining of race discrimination." As plaintiff's wages were not reduced while she was on paid leave, this allegation cannot refer to her having been placed on paid leave. As noted, claims that a plaintiff may bring under Title VII are limited to those presented in her EEOC charge. *See Younis, supra*. Therefore, even if being placed on a paid leave of absence could be deemed to be adverse employment action in the retaliation context, any such claim is not properly before the Court as part of plaintiff's Title VII case.

For these reasons, the Court concludes that plaintiff has failed to state a prima facie case of discrimination or retaliation under Title VII.

## II. Elliott-Larsen

### A. Discrimination

Defendant correctly argues that most of the items plaintiff identifies as supporting her discrimination claim do not suffice because they do not constitute "adverse employment action." Plaintiff complains that Daly discriminated and retaliated against her when he placed her on paid leave for fifteen weeks. But being placed on paid leave and then returned to work with no material changes is not adverse action for either discrimination or retaliation purposes. *See supra* at 19 and note 5. Plaintiff was returned to her same position with no change in pay.

---

her company-issued laptop, and then placing her on a ninety-day performance plan with various conditions. This is not comparable to plaintiff's fifteen-week paid leave with no other conditions. Plaintiff cites no authority for the proposition that being placed on paid leave *by itself* may constitute adverse employment action under Title VII.

Plaintiff also points to the changes HR director Poplar made in July 2017 upon plaintiff's return to work after her paid leave ended. These changes do not constitute adverse employment actions. Plaintiff complains that her title was changed from purchasing manager to senior purchasing coordinator, but her pay remained the same and her duties changed only slightly because now she had to coordinate more with her co-worker, Stephanie Jaeger. Plaintiff complains she lost her secretary (Jaeger), but Jaeger was still there, just with increased responsibility so that she would not be doing plaintiff's clerical work any longer. Plaintiff also points to her "office relocation," but she has no entitlement to a particular office. This complaint borders on being ridiculous, and it certainly is not actionable discrimination.

Plaintiff also complains, as discussed above, that Daly denied her request for a promotion to "purchasing director." It is not discriminatory for an employer to decline to promote an employee to a nonexistent position.

In her response brief, plaintiff asserts that she was "denied attendance at critical meetings pertaining to her job function." Pl.'s Br. at 21. She provides no citation to the record to support this statement. Nor does she indicate the date(s) when this happened. A genuine issue of material fact cannot be premised on unsupported allegations.

The only item plaintiff identifies that might constitute adverse employment action is her allegation that she was "denied access to critical information and programs," *id.* at 21, apparently from 2014 through 2016. Plaintiff cites to pages 42-44, 52, and 65 of her deposition to support this claim. At these pages, plaintiff testified that Williams (the finance director) "did not get me on the . . . complete purchasing system for years," but that Williams did put two white men (Randy Dellaposta and John Bennett) on this system. Plaintiff also refers to this system as the

"purchasing module." Because she was not on this system, plaintiff says "it took a lot more effort

to do the job." Pl.'s Dep. at 65. In support of her argument that being "[d]enied access to training

opportunities constitutes an adverse employment action," Pl.'s Br. at 22, plaintiff cites just one case,

*Young v. McHugh*, 24 F. Supp. 3d 658 (E.D. Mich. 2014). In that case, Judge Drain found that

plaintiff had demonstrated she had suffered adverse employment action by showing

> (1) she was denied training opportunities that were offered to Anick
> and Estep; (2) her seat was moved to an isolated area that was
> separated from the rest of the payroll team by a locked door (which
> interfered with her access to data, files, and the tools needed to
> perform her job); (3) she was denied access to common software
> tools and then labeled incompetent; (4) Defendants caused negative
> flags or "clearance inquires" to be lodged against Young's security
> clearance; (5) as a result of the clearance inquires, Young was denied
> access to certain software applications, hindering her ability to
> perform her job; and (6) she received adverse evaluation reports that
> she would not have otherwise received but for the Defendants actions
> in setting her up for failure.

*Id.* at 666. Obviously, these are more onerous conditions that plaintiff alleges in the present case.

Plaintiff seems to be complaining that she was not provided training by a company called Precision,

but the finance director, Williams, told plaintiff in April 2016 that "Precision will cost $150 per

hour. We do not have that budgeted anywhere." Pl.'s Ex. 6. Williams wanted plaintiff to get

training from "your fellow employees." *Id.*

Plaintiff's vague deposition testimony does not establish that she was subjected to

adverse employment action. She was able to do her job for many years, and she does not allege that

she was ever disciplined for poor work performance or explain how being denied access to this

computer program could be deemed to be "akin to termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices that might be unique to [her]

particular situation." *Chen,* 771 N.W.2d at 839.

### B. Retaliation

While the basis for plaintiff's Elliott-Larsen retaliation claim (which, unlike the Title VII retaliation claim, is not limited by the allegations in her EEOC charge) is not entirely clear from the complaint or her response brief, the claim appears to be that Daly placed her on paid leave in retaliation for her complaints in March 2017 about HR director Poplar and that Poplar changed plaintiff's title and moved her office when she returned from leave.

As discussed above, defendant did not take adverse employment action against plaintiff by placing her on a paid leave of absence, changing her title (but not her pay or any significant job conditions), moving her office, or promoting her secretary so that plaintiff no longer had access to a secretary to do her clerical work. As part of her prima facie case under Elliott-Larsen, plaintiff must show that the adverse action taken by defendant was "akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to [her] particular situation." *Chen*, 771 N.W.2d at 839. The action taken by defendant in this case does not rise to this level.

### Conclusion

For the reasons stated above, the Court concludes that plaintiff has failed to show that defendant took any adverse employment action that is sufficient to make out a prima facie claim of

employment discrimination or retaliation under Title VII or Elliott-Larsen.  Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is granted.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  March 20, 2020
          Detroit, Michigan